William WEBER, t/a Garden State Press Clipping Bureau, Plaintiff,

v.

Arthur V. WYNNE, Sr., Arthur V. Wynne, Jr., Harold E. Wynne and Frederick J. Wynne, a partnership, t/a Burrelle's Press Clipping Service & New Jersey Press Clipping Service, Defendants.

Civ. A. No. 72–1184.

United States District Court, D. New Jersey.

Feb. 24, 1977.

Byrne & Donnelly, by David P. Donnelly, Wall Township, N. J., for plaintiff.

Shepard, Cooper, Dickson, Merkelbach & Camp by Donald W. Merkelbach, Upper Montclair, N. J., for defendants.

## OPINION

LACEY, District Judge.

This is an antitrust action brought under the jurisdictional grant of 15 U.S.C. § 15, charging a violation of the anti-monopoly provisions of the Sherman Act. 15 U.S.C. § 2.[1] Weber conducts in Red Bank, New Jersey, a press clipping bureau under the name of Garden State Press Clipping Bureau (hereinafter Garden State), and sues his competitor, Burrelle's Press Clipping Bureau, a New Jersey partnership (hereinafter Burrelle's), and New Jersey Press Clipping Bureau (hereinafter New Jersey Clipping), a regional division of Burrelle's, and, as well, individual officers and partners of each (Arthur Wynne, Sr., Arthur Wynne, Jr., Harold Wynne, and Frederick Wynne). Plaintiff initially charged violations of 15 U.S.C. §§ 1, 2. and 13(a), and unfair competition under the law of New Jersey. At pre-trial plaintiff formally abandoned Counts I, III and IV of the complaint and now simply charges a violation of 15 U.S.C. § 2 (hereinafter sometimes Section 2).[2]

The complaint contends that New Jersey Clipping's operations in New Jersey, while

1. 15 U.S.C. § 2 provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

2. Just prior to trial, and during trial, plaintiff sought once again to inject a Section 1 claim into the case by revival of Count I of the complaint. Defendants' objection to this was sustained.

Section 1 provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: *Provided,* That nothing contained in sections 1 to 7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under section 45 of this title: *Provided further,* That the preceding proviso shall not

concededly local, are supported and subsidized by Burrelle's national operations and revenue, thus enabling New Jersey Clipping to adopt a predatory pricing policy and to undercut, in the New Jersey market, plaintiff's prices for similar services, in an attempt to monopolize the press clipping business in the relevant New Jersey press clipping market, at plaintiff's expense.

Just prior to trial the defendants moved to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim under Fed.R.Civ.P. 12(b)(1) and (6); for judgment on the pleadings under Fed.R. Civ.P. 12(c); and for summary judgment under Fed.R.Civ.P. 56(b). After argument, the court, mindful of the nearness of trial, reserved decision on the motions and ordered trial on the merits. *Cf., Mortensen v. First Federal Savings & Loan Ass'n*, 549 F.2d 884, (3d Cir. 1977). Now, after trial, I hold that this court has federal subject matter jurisdiction over the controversy.[3] On the other hand, I hold that plaintiff has failed to prove his claim on the merits.

## I.

## JURISDICTION

The plaintiff and the defendants run press clipping bureaus. Businesses, institutions, governmental agencies, and individuals place orders with these bureaus to read newspapers and to cut out and supply to them clippings referring to these customers or to a topic or topics selected by them. There are two types of clipping bureaus, national and regional. The defendant Burrelle's operates both a national and a regional bureau. Under its own name it supplies to its customers clippings from newspapers published throughout the United States. Its New Jersey division, New Jersey Clipping, however, supplies customers only with regional service, and for these customers reads and obtains clippings only from New Jersey papers, and publications from New York City and Philadelphia.[4] For this service, be it national or regional, the customer is usually billed a monthly reading charge, or a charge per clip, or a combination of both.

The process by which the plaintiff and defendants provide clips to customers is as follows: the publications are delivered to the premises and are then distributed to readers. They read the publications and mark the clips, according to customer. The clips are then passed to a stamping machine which stamps the slips on which the clippings are mounted. From there the clips go to the cutting room, are cut from newspapers, pasted on the slips, and then sent to the filing room and filed by customer name. Thereafter, they are shipped out by the shippers.

Prior to the plaintiff's entry into the New Jersey market in 1965, if anyone wanted

make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1 to 7 of this title to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

**3.** The court has received and read the parties' briefs on the issue of subject matter jurisdic-

tion. In addition, the court has heard oral argument on that issue. Moreover, the court has considered the testimony of the parties and witnesses at trial as well as other evidence submitted to the court. Therefore, all evidence relevant to the jurisdictional issue is now before the court. For record purposes, all motions as to which decisions had been reserved, are denied.

**4.** Burrelle's national service reads approximately 1,800 newspapers, 9,000 weekly newspapers and 3,500 trade and consumer publications published throughout the United States. In 1976, New Jersey Press Clipping Service read 27 daily and 300 weekly newspapers which constituted all of the daily, Sunday and weekly newspapers in New Jersey plus 55 college publications and 295 periodicals.

press clipping service with only New Jersey coverage, he had no alternative but to take Burrelle's national service, with nationwide coverage of newspapers, *see* n. 4, *supra*, and pay a national rate.[5] Thus he was paying for "reading" he did not want.

Seizing this competitive opportunity, Garden State, purchased for $1.00 by Weber in 1965, began to offer a specialized New Jersey service, founded upon reading New Jersey newspapers almost exclusively, at a rate less than half of what Burrelle's was then charging its New Jersey customers for its national service.

Faced with the loss of business to Garden State, Burrelle's in October 1970, responded to this competition by forming a New Jersey operating division (New Jersey Clipping), and in its name began to offer its New Jersey customers a regional service, much like plaintiff's, covering primarily only New Jersey newspapers. Since that time, defendants, through New Jersey Clipping have engaged in competition with Garden State on this basis in the New Jersey market as hereinafter defined.[6]

■ As is well settled, plaintiff must demonstrate that the activity complained of occurred in or substantially affects interstate commerce for jurisdiction over the subject matter of this action to vest in this court. *See Goldfarb v. Virginia State Bar*, 497 F.2d 1, 15–16 (4th Cir. 1974), *rev'd on other grounds*, 421 U.S. 773, 780, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). *See also Doctors, Inc. v. Blue Cross of Greater Philadelphia*, 490 F.2d 48, 50 (3d Cir. 1973); *Mortensen v. First Federal Savings & Loan Ass'n*, *supra*, 549 F.2d 884, at 896–897; *Evans v. S.*

*S. Kresge Co.*, 544 F.2d 1184 (3d Cir., filed November 2, 1976). *See also, Taxi Weekly, Inc. v. Metropolitan Taxicab Bd. of Trade, Inc.*, 539 F.2d 907, 909 (2d Cir. 1976).

The plaintiff argues that because Burrelle's is in interstate commerce and is allegedly using its profits therefrom to implement and sustain, through New Jersey Clipping, the alleged predatory pricing designed to injure or destroy plaintiff in the New Jersey market, the activity complained of is actually "in interstate commerce," notwithstanding its limited local impact. Also, in what is essentially a refinement of the same argument, plaintiff claims the activity complained of is "in interstate commerce" because New Jersey Clipping, the alleged predator, is merely an intrastate division of an entity engaged in interstate commerce. Finally, plaintiff contends that, even if the activity in question is held to be solely intrastate, it has a "substantial effect" on interstate commerce.

Defendants contend that because the relevant market is an intrastate market, this court has jurisdiction under Section 2 only if the alleged wrongful conduct had a substantial effect on interstate commerce. They further assert that, to ascertain whether there is such a "substantial effect," you look to the *plaintiff's* position to see whether, if he is eliminated or weakened as a competitor, this will result in a substantial reduction of the flow of supplies in interstate commerce, as in *Hospital Bldg. Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); and *Doctors, Inc. v. Blue Cross of Greater*

---

**5.** Actually, while substantially accurate, this finding must be qualified by noting that there were three other press clipping bureaus in New Jersey prior to October 1970, doing a minimal amount of business. It is significant that Burrelle's was at least a substantial factor in the New Jersey press clipping market prior to the formation of New Jersey Clipping.

**6.** The stipulated revenues for Burrelle's (national) and Garden State during the years stipulated were:

| | Burrelle's | Garden State |
|---|---|---|
| 1970 | $2,973,375.94 | $34,592.97 |
| 1971 | 3,027,347.12 | 39,662.86 |

| 1972 | 3,097,129.19 | 37,874.73 |
| 1973 | 3,407,049.89 | 45,332.68 |
| 1974 | 3,382,830.31 | 45,591.00 |

During the years 1971 through 1974, New Jersey Clipping earnings show a consistent increase except for one year, 1974. Those earnings are as follows:

| 1971 | $166,071 |
| 1972 | 170,342 |
| 1973 | 187,387 |
| 1974 | 186,055 |

At the time of trial New Jersey Clipping had 420 customers. Plaintiff had, in 1975, 92 customers; and did not furnish its figures for 1976.

*Philadelphia, supra. See also, Evans v. S. S. Kresge Co., supra.*[7]

I will deal with the defendants' jurisdictional contentions first. Undeniably, under appropriate circumstances, courts have looked to the nature of the business of an injured plaintiff in Section 2 cases. *Hospital Bldg. Co. v. Trustees of Rex Hospital, supra,* 425 U.S. at 744, 96 S.Ct. at 1848. On the other hand, there is nothing in *Rex Hospital* to suggest that the activity of a defendant must be ignored. Thus, in *Mortensen v. First Federal Savings & Loan Ass'n, supra,* 549 F.2d 884, at 897 the Court of Appeals for the Third Circuit relied largely upon the effect of the alleged wrongful activity on the defendant Association's interstate business. *See also, Evans v. S. S. Kresge Co., supra.* Viewing this case in this light, it is clear that this court has subject matter jurisdiction under Section 2 in that the alleged wrongful activity of the defendants, if accompanied by the intent to monopolize, as plaintiff charges, would affect interstate commerce to a substantial degree. Given this resolution of the jurisdiction issue, there is no need to examine the other bases urged by the plaintiff for establishing federal subject matter jurisdiction in this court over this controversy.

## II.

### PLAINTIFF HAS FAILED TO PROVE A VIOLATION OF SECTION 2 OF THE SHERMAN ACT

Count II of the complaint charges the defendants with attempting to attain a monopoly of the press clipping bureau business "in the relevant market of New Jersey" in violation of Section 2. The essential elements to be proved by the plaintiff if he is to sustain his burden imposed by a charge of attempting to monopolize are that the defendants have (1) a specific intent to monopolize the relevant market; and (2) sufficient market power to come dangerously

close to success. *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Swift & Co. v. United States,* 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905); *Yoder Bros., Inc. v. California-Florida Plant Corp.,* 537 F.2d 1347, 1366–67 (5th Cir. 1976); *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338, 1348 (3d Cir. 1975).

The first step in any Section 2 analysis is to define the relevant market. The parties here have stipulated the relevant market to be:

> The rendition of the services of reading and clipping newspaper and magazine articles that appear in New Jersey, New York City and Philadelphia daily newspapers. The geographic boundaries of the relevant market are the boundaries of the State of New Jersey. The relevant market is, therefore, an intrastate market. Stipulation of Facts at 4.

This court, based upon its own assessment of the facts, concurs in the parties' agreement and I find the relevant market to be as stipulated.

At the heart of the plaintiff's charge of attempted monopoly is the allegation that since 1970 the defendants have used New Jersey Clipping as a mechanism for predation, namely, pricing its clipping services in the relevant market below cost with the intent to destroy Garden State as a competitor in said market. It is plaintiff's position that Burrelle's has been using its revenue from its national operations to subsidize its New Jersey regional operation, enabling New Jersey Clipping to effectively underprice Garden State. I shall examine the evidence with respect to this aspect of the plaintiff's claim hereinafter.

Turning to the second requisite for proving an attempt to monopolize, "sufficient market power to come dangerously close to success," the court has been advised that New Jersey Clipping has, since 1971, the

---

**7.** If consideration were to be given only to the effect upon interstate commerce of plaintiff's elimination from the market, subject matter jurisdiction would plainly be lacking. As plaintiff concedes, his own transactions in interstate commerce rarely exceeded $1,600 annually. *This is hardly in the "substantial" realm. See Page v. Work,* 290 F.2d 323, 330 (9th Cir. 1961).

first full year of its operation, and for each year thereafter, occupied 77% of the relevant market. Garden State, for the years 1971–1973, ranged between 17% in 1972 and approximately 18.5% in 1971, 1973 and 1974, the last year for which this information was furnished.

While these figures demonstrate that New Jersey Clipping for the years mentioned had an overwhelming percentage of the relevant market, a further word of explanation is required to cast them in the proper perspective. As has already been noted herein, n. 5, *supra*, the court has not been furnished any data as to the percentage of relevant market held by Burrelle's for the years prior to 1971.[8] However, it is clear to this court from all of the evidence that Burrelle's played a very substantial role in the New Jersey press clipping market in that earlier period, notwithstanding that it quoted only national rates. Moreover, while the court has been furnished with data representing revenue derived from the relevant market by Garden State for the earlier period mentioned, again percentage of market has not been furnished.

Since the plaintiff bears the burden of proof on all of the essential elements, he cannot be heard to say that the advent of New Jersey Clipping on the scene in October 1970, accompanied by the utilization of alleged predatory pricing, resulted in a substantial reduction in the percentage of the market held by plaintiff or in a substantial increase in the percentage of the market held by the defendants. Instead, for all

that appears in this record, Burrelle's has maintained either in its own name, or in the name of New Jersey Clipping Service, approximately the same percentage of the New Jersey market during the years preceding and after October 1970. A valid inference can also be drawn that in the years preceding October 1970 Garden State's share of the relevant market, notwithstanding the increased revenue figures furnished, remained relatively stable, as, indeed, it did from 1971–1974. It is in this light that I turn to an examination of the question thus presented: whether the percentage of the relevant market occupied by New Jersey Clipping demonstrates either that monopoly has already been achieved, or represents "sufficient market power" so that New Jersey Clipping, given the requisite intent, can come dangerously close to monopolizing the relevant market.

■ To determine whether a defendant actually possesses monopoly power, it must be determined whether it has the "power of controlling prices or unreasonably restricting competition." *United States v. DuPont de Nemours & Co.*, 351 U.S. 377, 389, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956). Proof of such matters may be direct or indirect. An overwhelming share of the relevant market is an indication, albeit indirect, of a defendant's market power to control prices or unreasonably restrict competition. Indeed, such an "overwhelming percentage" may establish a rebuttable presumption of monopoly. *United States v. Grinnell Corp.*, 236 F.Supp. 244, 257 (D.R.I.

---

8. The term "relevant market," when applied to press clipping users in New Jersey prior to 1971, includes all customers, whether or not based in New Jersey, who wanted New Jersey coverage, and obtained it either through local services like plaintiff's, or Mutual, or national (i. e. Burrelle's). The parties have not given the court any analysis disclosing what shifting within this market took place after October 1970, that is, how many of Burrelle's "national"

customers in New Jersey remained national, how many shifted over to New Jersey Clipping, how many to Garden State, how many to Mutual, and how many customers came into the New Jersey market as first-time users of clipping services.

The following represents the percentage of relevant market controlled by each competitor from 1971 to 1974:

| | Total Market | New Jersey Percentage | Garden State | American | Mutual | Luce |
|---|---|---|---|---|---|---|
| 1971 | 214,535 | .774 | .184 | .015 | .023 | .002 |
| 1972 | 216,681 | .786 | .174 | .015 | .023 | .0007 |
| 1973 | 241,600 | .775 | .188 | .013 | .02 | .002 |
| 1974 | 239,945 | .775 | .190 | .014 | .12 | No figures available |

1964), *modified*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

■ To have "control" of the relevant market, it is not required that a party actually exclude competitors from it; there may be a violation of Section 2 if he has the *power* to exclude actual or potential competitors from the field, and the intent to do so. *American Tobacco Co. v. United States*, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). Control of prices is one manner by which such actual or potential competitors may be driven out of the market. *Keco Indus. Inc. v. Borg-Warner Corp.*, 334 F.Supp. 1240, 1245–46 (M.D.Pa.1971).

■ Notwithstanding the presumption of monopoly power derived from the percentage of the relevant market occupied by New Jersey Clipping, I find that the presumption has been rebutted and overcome by the evidence tendered by the defendants to show that their market share which, as I have already indicated, has remained relatively stable for many years, was attributable to their "skill, efficiency, foresight, or like affirmatively laudable business conduct." *United States v. Grinnell Corp., supra*, 236 F.Supp. at 257.

I find that Burrelle's up to 1970 and New Jersey Clipping thereafter offered a service that was superior to that rendered by Garden State. Thus, even on a limited regional basis upon which New Jersey Clipping operated, it read more publications than did Garden State. Additionally, to the extent a New Jersey customer wanted to move to expanded coverage, Burrelle's national service was instantly available. New Jersey Clipping's service was also rendered more quickly in that clippings from daily newspapers could be and often were mailed out the same day as the article appeared in the publication. There is evidence as well to strongly suggest that Weber lost business from time to time because of inefficiency in his operation.

Quite aside from how New Jersey Clipping was able to maintain after October 1970 what I have found to be essentially the same percentage of the relevant market occupied by Burrelle's before that time, the factor of the ability to control prices is, to a substantial degree, a function of the nature of the relevant market in terms of the ease of entry. Thus, there is obviously a limit to which prices can be raised in a market into which competitors can, with a minimum of expense and capital outlay, enter. The relevant market in this case is a peculiar one in that little, if any, capital is required to commence business as a press clipping service, particularly on a local level such as is here involved.[9]

Finally, with respect to the aspect of monopoly power, notwithstanding the charges hurled at the defendants by the plaintiff in this case, there has been no appreciable upward movement of percentage of market occupied as far as defendants are concerned and, conversely, the plain-

---

**9.** That the barriers to entry into the relevant market are so low as to be almost non-existent is plain. This was established by the testimony of Robert Waggoner (Trial Tr. of Nov. 30, 1976, at 27, which I found credible and accept. Almost no capital outlay is required. Weber in 1966 was in business with only $991 worth of publications for the year. In 1974 he spent $2,541 for newspapers, of which about 10% or $250 was for out-of-state newspapers. Stipulation of Facts 78–79. Aside from newspapers, all a press clipping service needs to go into business is a pair of scissors, a desk and a photocopying machine, a total capital outlay of $1,000 to $2,000. Additionally, "entry" is readily available for customers seeking local service. If price becomes too high, they can easily and cheaply provide their own clipping service. Indeed, this latter factor makes it somewhat difficult to say what the "market" in dollars actually is in any given year. In any case, given this "ease of entry," a prudent businessman would not price his service as high as possible on a short-term basis because too many would be attracted to come in, and many customers could drop out of the market. Interestingly, this is not an empty abstraction. As is stated hereinabove and hereinafter, several customers of Burrelle's unhappy with paying a "national" rate for local coverage, shifted to Garden State, a newcomer in the field, to get the benefit of its lower rate. These included Rutgers, American Cancer Society, New Jersey Department of Labor and Industry, New Jersey Savings League, New Jersey Association of Realtor Boards, Trenton State College and Bamberger's.

tiff's share of the market has, with the exception of a slight dip in 1972, remained at the same level.

Not only do I find that defendants presently do not monopolize the relevant market; I also find that they do not have "sufficient market power to come dangerously close" to monopolizing said market. What has been said with respect to the matter of actual monopoly is equally applicable in connection with the "dangerously close" issue. For the same reasons that defendants could not presently possess monopoly power, they do not possess "sufficient market power" to achieve a monopoly of the relevant market.[10]

I now turn to the first of the factors which must be examined in an "attempt" case under Section 2, that is, has the plaintiff proved that the defendants had "a specific intent to monopolize the relevant market." It was to this issue that the plaintiff addressed most of his proof. In specific terms, plaintiff urges that the predatory pricing practices of the defendants, exercised through New Jersey Clipping, are sufficient to establish such specific intent as the law requires.

■ As has been noted, "a specific intent to destroy competition or build monopoly is essential to guilt for the mere attempt." . . . *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953). This specific intent may be demonstrated by showing predatory acts of an alleged monopolizer in furtherance of that attempt. *Id.* at 627, 73 S.Ct. 872.

■ Plaintiff rests his claim of predation upon two factors allegedly reflected in defendants' pricing policies, varied and discriminatory prices and prices below cost.

An assessment of the pricing policies of both New Jersey Clipping and Garden State is thus indicated.

While the parties speak of "standard" rates, even in their stipulations, the price "mess," as Weber described the industry's pricing to be in 1965 in New Jersey, Trial Tr. of September 1, 1976, at 31, even up to trial had not stabilized in the relevant market.

In 1969, Garden State charged for its New Jersey coverage a "standard" rate for old customers of $20 a month and $.15 a clip and a "standard" rate for new customers of $23 a month and $.18 a clip. As of January 1970 it charged three accounts a flat rate of $.10 per clip plus postage, with no reading charge. Within six months it increased one of these three accounts to $.13 per clip while keeping the others the same; and there was no difference in the service provided the three accounts. Special per-clip rates are still maintained for these accounts, one paying $.15 per clip, another $.17 per clip.

Moreover, plaintiff stipulated that during the period January 1970 of May 1974, Garden State charged 17 different rates, with customers in roughly the same category apparently, paying different rates at the same time. Stipulation of Facts at 84. An exhibit annexed to the stipulation shows the wide variety of prices charged various customers. While some effort was made to justify the differences upon the basis of class of customer, or quantity of clippings furnished, it cannot be denied that Weber's whim or "judgment" accounted for whatever he decided he would charge a customer. *See* Def. Ex. 76–120. *See also* Stipulation of Facts at 85 and attachment thereto. Trial Trans. of Dec. 1, 1976, at 8.

10. In 1969 Garden State serviced 69 customers; in 1970, 85; in 1971, 88; in 1972, 78; in 1973, 83; in 1974, 90; in 1975, 92. The drop-off in 1972 was caused, in part at least, by the loss to New Jersey Clipping in 1971 of a State of New Jersey bid which lost Garden State a substantial amount of several state agencies' business in 1972. It is evident that plaintiff has grown and continues to grow in terms of business done, both as to gross revenue and number of customers. The testimony of plaintiff's expert, Baker, must be rejected to the extent it is to the contrary; and I shall deal with it at a later point in this opinion. The agencies lost, it is noted, are among those that plaintiff claims he lost as a result of defendants' alleged wrongdoing. As related hereinafter, plaintiff had bid $.18 per clip for this business, defendants $.16 per clip. Plaintiff has not proved this price was a predatory price.

In 1969, Burrelle's national rate was $45 a month and $.20 a clip. As of November 1976 the price for the national coverage was $65 per month and $.32 a clip. Between 1970 and 1974 Burrelle's prices for national service steadily increased as follows:

| January 1970 | $45 and $.20 |
| January 1971 | $48 and $.20 |
| May 1971 | $48 and $.25 |
| January 1972 | $50 and $.25 |
| August 1973 | $55 and $.25 |
| March 1974 | $60 and $.25 |

Garden State just prior to October 1970 took several New Jersey customers away from Burrelle's. Stipulation of Facts at 26, 28, 98, 100. Understandably, Burrelle's did not react kindly. This spurred the formation of New Jersey Clipping.

At the time New Jersey Clipping entered the relevant market with its regional or local service, Garden State was charging some customers a "standard" rate of $23 per month reading charge and $.18 per clipping, and Mutual was charging $20 per month and $.18 per clipping. Stipulation of Facts at 31.[11]

One of the factors defendants took into account in setting the New Jersey Clipping price of $20 and $.18 was the competition. Stipulation of Facts at 33.

Plaintiff contends that this starting price of New Jersey Clipping of $20 per month and $.18 per clip was predatory, below cost, and representative of the requisite "intent" to monopolize. This court finds otherwise. It is true, of course, that this price was far less than Burrelle's national service price; however, the service rendered, coverage of New Jersey publications (with some from New York City and Philadelphia), was only a small fraction of the national coverage sold by Burrelle's. Moreover, it matched Mutual's price; and, as already noted, Gar-

den State was at the time charging many of its customers a rate lower than the "standard" $20 and $.18 per clip. While pricing below cost may be "a severely anti-competitive tactic," *Ovitron Corp. v. General Motors Corp.*, 295 F.Supp. 373, 378 (S.D.N.Y. 1969), pricing below a competitor is not. *Gold Fuel Service, Inc. v. Esso Standard Oil Co.*, 306 F.2d 61, 64 (3d Cir. 1962); *and see International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714, 721–723 (5th Cir. 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976).

The concept that pricing below one's costs lends the inference of a specific intent to destroy a competitor, is consistent with the logic that a prudent businessman will ordinarily set a price which insures him a profit. Thus, when we talk in terms of "pricing below cost," we mean setting of a price which results in a return of revenue per item less than the total cost of producing that particular item, that is, a net loss on the sale. Plaintiff has failed to prove that the $20 and $.18 price was a price which led to a net loss, per item sold to the defendants.

It is misleading to contend, as plaintiff does, that if Burrelle's had "fully allocated" its costs in October 1970, the cost per clip furnished by New Jersey Clipping would have been $.35 or $.36 per clipping. In the first place, there was no basis for fully allocating costs, either in broad economic terms, or in terms of the press clipping industry. Burrelle's in furnishing a national service, provided coverage in excess of 30,000 publications. For its New Jersey customers, New Jersey Clipping covered less than 700 publications. With a full allocation of costs by defendants, New Jersey customers would be sustaining to a degree the pricing to national customers. The customer would have been paying what he was before October 1970 but getting less coverage for his money.

Unfortunately, the parties have not told me what their costs were or are for rele-

11. It is important that it be understood that Garden State's "standard" rate was only for some customers. As will be noted, it had at least seventeen different rates for its various customers at this time.

vant market coverage. Plaintiff, it would seem, is in the best position to do so, since he operates only a local business. It can be fairly surmised, however, that his cost was less than the $.10 per clip he charged his accounts numbered 8, 10 and 83 in January 1970; the $.17 per clip he charges account number 10 today; the $.11 per name rate at which he has been selling to Retail Credit since 1971; and the various rates he has charged as reflected in the stipulated facts and exhibits.[12] It also can be fairly inferred that in October 1971 he would have made a profit on the State of New Jersey's work at $.18 per clip, his bid, if he had not lost out to New Jersey Clipping's $.16 per clip bid.[13]

Addressing the defendants' alleged pricing structure, it is true that New Jersey Clipping, in entering the relevant market, charged a wide variety of prices. I accept as true, however, the explanations offered and find them to sustain what was done as sound and proper business practice. Defendants appropriately refer to the checkerboard pricing practices of Garden State and convincingly argue that their own practices were compelled to meet competition. I also find that most if not all of the price variations were founded upon: volume or anticipated volume of the order; customers' demands for competitive rates; the degree of difficulty of filling the order; the type of customer, that is, charitable, governmental, public relations firms, or other; the length of time the order was to run; the geographical area covered, for example, three counties as opposed to the whole state; and personal relationship with the client.

There can be no question that defendants competed aggressively with plaintiff in the relevant market. In soliciting new business, New Jersey Clipping either matched the rate being charged by Garden State or Mutual, if the customer revealed it, or would set a competitive rate based upon what defendants thought the competition was charging. On the other hand, it is also without doubt that the plaintiff competed aggressively with Burrelle's pre-October 1970 and took customers away from defendants. That, however, is what our economic system features, strong and active competition. I do not find plaintiff has proved so much of its predation claim as is founded upon alleged discriminatory pricing.

Turning to the second facet of the predation claim, the allegation of pricing below cost, it is necessary to review certain fundamentals of the economist's art.

First, defendants had a right to change the nature of their business and to establish New Jersey Clipping, and to provide through it only New Jersey coverage, with, of course a correlative reduction in price. This did not come about through an abstract concern. Defendants were losing customers to plaintiff who was virtually without competition in providing regional, that is, solely New Jersey coverage.

Next, the fact alone, without more, that New Jersey Clipping was able to and did price below Garden State in many instances does not reflect a Section 2 intent. *Gold Fuel Service, Inc. v. Esso Standard Oil Co., supra,* 306 F.2d at 63.

Turning now to the matter of "cost," and plaintiff's contention that New Jersey Clip-

12. I find Weber's testimony on what his own costs and break-even point were to be confusing and self-contradictory. He had never done a cost analysis. At one point he took the position he could not make a profit at $.16 per clip, yet, as noted in the text, he was servicing accounts at $.10 per clip. Later, he testified that he made a profit in 1971 on a rate of $20 a month and $.15 per clip, with 25 clips free; but he did not know how much profit he made. On the other hand, if he could make a profit at this rate, how can he validly assert a $20 and $.18 rate, charged by New Jersey Clipping, was below "cost"? All in all, it was clear to the court that Mr. Weber had little or no idea of how to price his product and lacked the knowledge of basic economics involved in arriving at sound price formulations.

13. Indeed, the claim is that the profit in this lost business is about 50%. From this it can be inferred that his cost per clip was $.09. Since Weber does not claim he operates more efficiently than New Jersey Clipping, the latter's costs per clip would be no more than this $.09 figure. In fact, as I later find, its costs per clip were about $.05.

ping priced below cost, in the press clipping industry fixed costs are an extraordinarily high percentage of total costs. Fixed costs do not vary with changes in output and include reading labor costs, cost of publications purchased, and normal overhead of the building housing the business. Thus, when another customer is added, rarely is it necessary to purchase additional publications; and the reader or readers simply add another name (and/or topic) to the list of references to be checked.

Variable costs vary with changes in output; they are directly related to the value of business. In the press clipping industry they include the cost of cutting, clipping and postage.

Marginal 'or incremental' cost is the increment to the total cost that results from producing an additional increment of output. In the press clipping industry, therefore, marginal cost would be the cost to cut, prepare and ship an additional clipping.[14]

In this case, the marginal cost of producing a press clipping is the same as its average variable cost.[15] Accordingly, in the press clipping industry, marginal cost must be below a firm's average total cost, which is the sum of fixed cost and total variable cost, divided by output. However, since any price at or above marginal cost does not decrease short-run net returns, such a practice is not anti-competitive. In that regard, I find persuasive the Fifth Circuit's decision in *International Air Industries, Inc. v. American Excelsior Co., supra,* and its reliance upon the article by Areeda and Turner on predatory pricing. *See* note 14, *supra.*

In *American Excelsior,* the court defined predatory price behavior as price conduct which sacrifices present revenues for the purpose of driving a competitor out of the market, with the hope of recouping those losses through subsequent higher prices.

517 F.2d at 723. The court also stated as to the term "predatory intent" (517 F.2d at 722–723):

Judicial use of the term "predatory intent" is troublesome. Several cases hold that from a finding of certain actions, the trier of fact may infer predatory intent, and from this inference the proscribed inimical effects upon competition in turn may be inferred. However, application of these principles is particularly difficult, for predatory intent has never been clearly defined. Its appearance has been characterized by phrases such as "putting a crimp" into one's competitors, punitively or destructively attacking other firms, and acting vindictively with punitive effect. But any price decrease by a legitimately competitive firm will necessarily have a non-remunerative effect upon other firms in the market, if only by decreasing their profit margins. It is therefore important to clearly indicate the types of business behavior which violate the Act. (footnotes omitted)

Like the *American Excelsior* court, I believe that a price above average cost is a competitive price. Such a price is profitable to a seller. 517 F.2d at 723. That it could have been set higher does not mean that setting it just slightly above average cost is predatory. What then is the difference between predatory and competitive pricing? The line must be carefully drawn. Otherwise, the public could be denied a reasonable and competitive price because a seller feared being charged with predation. What "cost" is to be considered in deciding whether a price is beneath it?

I follow the *American Excelsior* and the Areeda and Turner analysis and find that any price which is at or above average variable cost may be competitive but is not predatory. Under such circumstances a

---

14. Areeda and Turner, Predatory Pricing and Related Practices under Section 2 of the Sherman Act, 88 Harv.L.Rev. 697 (1975) (Areeda and Turner); Waggoner, Trial Tr., Nov. 30, 1976, at 17–20.

15. This is because each clipping for a particular customer is unaffected by the demand for the total quantity of clips produced by the company since consumer demand is oriented to the individual customer's requested subject. Average variable cost is a total of the costs that vary with changes in output divided by the output.

firm is not then sacrificing present income for any anti-competitive objective.[16] *Id.* at 724.[17] Moreover, to hold such a price predatory would be to allow the survival of inefficient competitors.

■ In the case at bar, although the press clipping industry profit-cost picture is not free of all doubt, I find that New Jersey Clipping's average variable cost per clip was approximately $.05.[18] There has not been presented to this court any sale by New Jersey Clipping below this average variable cost. Since defendants' net revenues would then increase with any sale, they would not have had to subsidize any losses in the New Jersey market with their profits from national operations. *See International Air Industries, Inc. v. American Excelsior Co., supra,* 517 F.2d at 725. Moreover, New Jersey Clipping would not be able to reap the benefits of predation by merely charging below its profit maximizing price, since new entry would still be possible. Pricing above average variable costs is thus not predatory or a violation of Section 2 of the Sherman Act.

■ To accept the plaintiff's argument (that is, to find predatory intent in New Jersey Clipping's rate structure and failure to "fully allocate costs", would be to hold that Burrelle's, and, therefore, New Jersey Clipping, could not effectively compete with the plaintiff in the New Jersey regional market. The fact that Burrelle's, through New Jersey Clipping, was able to complete successfully in that market by using a previously established fixed cost apparatus is not to be considered predatory. Rather, Burrelle's action was taken to meet the competition in the New Jersey market which Garden State had presented. Size, coupled with an ability to meet competition effectively in a particular market, is not *per se* illegal where that size has been achieved by natural growth and a continuing exercise of lawful powers. Thus, competing fairly and aggressively, regardless of the consequences for one's rivals, is not condemned under Section 2 of the Sherman Act, absent a manifest purpose or intent to exclude competition. *International Railways of Central America v. United Brands Co.,* 532 F.2d 231, 239 (2d Cir. 1976).

In addition to the other rates already mentioned, defendants offered, until July 1972, a rate of $5 per month and $.15 per clipping to some customers of New Jersey Clipping. This was justified by defendants as being competitive and founded upon the expectation of high volume.[19] Plaintiff did lose certain customers to this rate; however, as I have already found, there was a difference in service involved and this rate, too, was above the defendants' incremental average variable cost.[20]

**16.** Theoretically, a reduction in price to marginal cost by a competitor could drive out an equally efficient firm.

**17.** More specifically, the dividing line for a finding of anti-competitive behavior is better placed at a firm's marginal cost, i. e., the incremental cost of making and selling the last unit produced. However, due to the difficulty one would confront in attempting to establish marginal cost as well as the fact that marginal cost is a function solely of variable costs, average variable cost is a viable substitute. As previously mentioned, however, marginal cost of a press clipping business is the same as its average variable cost. *See International Air Industries, Inc. v. American Excelsior Co.,* 517 F.2d 714, 724 (5th Cir. 1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976).

**18.** In 1972, it cost New Jersey Clipping $.0537 to produce an additional clipping (incremental cost), broken down as follows: 2 cents per clip for cutting; 7/10th of a cent for filing; 1.5 cents for shipping and slightly over 1 cent per clip for postage and handling. Waggoner testimony, Trial Tr. of Nov. 30, 1976.

**19.** New Jersey Savings League was on a rate from Garden State of $20 per month service charge and $.15 per clip and every month that the volume went over 200, the rate was then changed to a flat rate of $.12 per clip; the New Jersey Heart Association had a rate of $20 per month service charge and $.15 per clip for the first $500 spent during the year (this was an annual contract) and after $500, a flat rate of $.12 per clipping.

**20.** Clipping service customers are quickly and easily lost. Garden State, in a period when it largely dominated the relevant market, lost 13 accounts in 1968, 16 in 1969 (out of 69), and 25 in 1970.

Briod, one of, if not the largest account lost by Garden State to New Jersey Clipping, testified he shifted not because of rate but because

Accordingly, I find plaintiff has failed to prove a violation of Section 2 of the Sherman Act.

## III.

## PLAINTIFF'S DAMAGES PROOF FAILS ON THE FACTS AND LAW

The court's comments upon plaintiff's claim for damages are now set forth so that on any appellate review the court of appeals will be aware of my analysis.

Plaintiff's damages claim was essentially in two parts. First, he established a projection of annual growth of 40% in his gross revenue from 1967 to 1968; 25% in 1969; 38% in 1970; 14% in 1971; 4.5% loss in 1972; 20% increase in 1973; no increase in 1974; and a 5% increase in 1975.[21] From this, and plaintiff's expert, Baker's, analysis of plaintiff's income tax returns, it was computed that plaintiff had suffered a loss of growth in 1971–1974 amounting to $41,877 in net revenue. This was founded upon the assumption that net profit would have amounted to 52.14% of total sales.

As a second element in his damages, plaintiff claims his lost billings for each and every customer who left him and signed with New Jersey Clipping. His list includes customers who signed with New Jersey Clipping at the same rate at which they were at Garden State. Moreover, it includes Briod who testified he left Garden State because of poor service, Newark Academy, which left for the same reason, and various state accounts which left Garden State for New Jersey Clipping when the latter won a state bid award by bidding $.16 per clip as against Garden State's $.18.

As to the first claimed element, I find Baker's projection unreliable and reject it as a means for measuring lost opportunity for growth. Garden State had been purchased by Weber in 1965 for $1.00. We were not told what business he had done in 1965 or 1966. In 1967, however, his gross earnings were $13,252, or to use his 52% profit rate, a net profit of about $6,900. In 1968, the 40% growth rate in gross income produced $9,916 (again assuming the 52% profit rate), an increase of $3,000 in net profit. The next year, 1969, the net profit was $12,984, again an increase of $3,000 over the previous year. In 1970, there was a $5,000 increase in net profit, that is, to $17,988. In 1971, net profit was $20,624, about a $2,700 increase over the previous year.[22] Thus it can be seen that the use of a percentage increase in gross income is a distortion of realism, which, is, of course, to be measured by net profit growth. Put another way, it can hardly be supposed that Weber could have continued indefinitely an annual 40% growth (in gross income) which occurred from 1967 to 1968.

There are other vital links missing in plaintiff's claim for "stifled growth." No data was presented which reflected the percentage of the relevant market plaintiff occupied in the pre-1971 years. What competitors were there and how were they pricing relative to plaintiff? How did Garden State increase its market share (if it did) and by how much, if any? What was the reaction of its competitors? These and other critical questions remain unanswered.

I also find that the underlying data upon which Baker relied were unreliable; that Baker erred in not including in his assumed rate of profit a salary figure for Weber and

defendants offered superior service. Briod testimony, Trial Tr. of Dec. 1, 1976, at 6–7, 10–12. I accept his testimony as credible. See also, Lacy (Newark Academy) testimony, Trial Tr. of Nov. 30, 1976, at 68–69, whose testimony I found credible and accept.

21. For his computation of lost growth Baker averaged out the gross income increases for the years 1967–1971, 31.88%. This rate was then applied to the years after New Jersey Clipping

came into the field. To the extent gross revenue increase fell short of 31.88% each year thereafter, it was claimed as "stifled growth," and totalled for the years involved, $80,316. Then, applying a profit percentage of 52.15%, the lost profit was calculated at $41,877. Baker testimony, Trial Tr. of Sept. 2, 1976, at 11–12.

22. The net profit figure is a "before taxes" figure.

his wife;[23] that he was not an economist, had made no study of market growth, did not know the press clipping industry, and was not in a position to predict what plaintiff's market share would have been absent competition.

For the reasons stated, I would, if faced with the necessity of doing so, reject Baker's testimony on the "stifled growth" claim of damages as unreliable in fact and unsupported by law.

■ Turning now to the claimed loss of specific accounts, only one customer witness testified that, because of a lower rate, he shifted his business from Garden State to New Jersey Clipping. Plaintiff has failed to adduce testimony to support his claim for damages as to a large number of customers he contends he lost because of defendants' alleged predatory pricing.[24]

The largest item of claimed damage is the *Briod* account. Taking the amount he had billed Briod, $160.05 per month, from the time Briod shifted to New Jersey Clipping, January 1971, to the time of trial, the loss claimed is $10,895.61. Briod was a witness called by the defendants. As I have previously found, I believe his testimony that he left Garden State over dissatisfaction with the services being rendered.[25]

*Franklin State Bank's* business, at $29.54 a month for 55 months, beginning in January 1972, and totalling $1,624, is claimed. Yet plaintiff has introduced evidence showing this bank was charged a higher rate by New Jersey Clipping. *See* Plaintiff's Proposed Finding of Fact at 213. Defendants suggest that they charged this bank the same rate as did Garden State. This claim of damages is rejected. The shift is totally explainable in terms of better service, or other reasons unconnected with price.

*Middlesex County College*: A loss of $2,576 is claimed but rejected. Defendants charged the same rate as did Garden State. It did, however, offer 35 free clips as against 25 tendered by Garden State. The court has no way of knowing why this account left Garden State. Moreover, the rate, $20 and $.15, hardly was a predatory rate.

*Upsala College*: A loss of $4,331 is claimed but rejected. This account switched to New Jersey Press Clipping at the same rate it was receiving from Garden State. Even if it got additional coverage, as plaintiff contends, it was, by the same contention, charged more. Plaintiff has not proved that this constituted predatory behavior.

*Automatic Merchandising Council*: This account switched from Garden State to New Jersey at a higher rate of $25 per month service charge and $.18 per clip. The claimed loss of $1,440 is rejected.

*Newark Academy*: This account left Garden State for New Jersey at the same rate, because of dissatisfaction with Garden State's service. The claimed loss of $2,485 is rejected.

*New Jersey Licensed Beverage*: Plaintiff has adduced no testimony as to the reason for this account going to New Jersey Clipping. Garden State was charging it $23 a month and $.18 a clip. It went to New Jersey Clipping at a rate of $5 and $.15 per clip. The claim for $2,336 is rejected. Not only is causation not established; no reason is given why Garden State could not have recaptured this account as a customer after the $5 and $.15 rate was cancelled.

*New Jersey Petroleum Council*: The claim for $2,890 is rejected for the reasons

---

**23.** *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338 (3d Cir. 1975). Baker's computation seized upon a figure of $14,622 for salaries and wages; however, this did not reflect any compensation for Weber and Mrs. Weber.

**24.** Moreover, there is a woeful lack of causation proof, as more clearly appears in the discussion of plaintiff's claim related to loss of specific accounts. Regrettably, too, plaintiff's

claim as to "stifled growth" is obviously duplicative of the loss of specific accounts claim.

**25.** The business lost through specific accounts also affected Baker's calculations, as I have already pointed out. N.22, *supra*. To the extent the proof fails on these items it renders Baker's "stifled growth" computation even more suspect.

set forth in the paragraph immediately preceding.

*Standard Bred Breeders, etc.* : This is the only account lost as to which testimony was provided. Even here rate was only part of the picture. If plaintiff had proved its Section 2 claim, he would be entitled to claim a portion of his claimed loss of $1,362. Again, however, it is pertinent to inquire why plaintiff could not recapture this account when the $5 and $.15 rate was terminated.

*United Cerebral Palsy Association* : At the time New Jersey Press Clipping Service received this account, the customer was not using a press clipping service. The rate charged the customer was reduced because the customer pleaded its status as a nonprofit organization. The claim for $1,160 is rejected.

*New Jersey Department of Labor and Industry* : This account went to New Jersey Press Clipping Service pursuant to the State of New Jersey contract on October 1, 1971.

*New Jersey State Department of Health* : This account went to New Jersey Press Clipping Service pursuant to the State of New Jersey contract on October 1, 1971.

*New Jersey Public Broadcasting* : This account went to the New Jersey Press Clipping Service pursuant to the State of New Jersey contract on October 1, 1971.

*Newark State College* : This account went to New Jersey Press Clipping Service pursuant to the State of New Jersey contract on October 1, 1971.

*New Jersey Division of Motor Vehicles* : This account went to New Jersey Press Clipping Service pursuant to the State of New Jersey contract on October 1, 1971.

*New Jersey Alcoholic Beverage* : This account went to New Jersey Press Clipping Service pursuant to the State of New Jersey contract on October 1, 1971.

*Trenton State College* : This account went to New Jersey Press Clipping Service pursuant to the State of New Jersey contract on October 1, 1971.

All of the foregoing state accounts were lost by Garden State to New Jersey Clipping when the latter underbid the former $.16 to $.18 per clip. The claimed loss is founded upon the assertion that the $.16 bid was possible only because Burrell's absorbed all but incremental costs.[26] Plaintiff claims almost $30,000 in lost gross revenue, from the time he lost these accounts until trial, five years later. There is a basic flaw in his analysis. We are not told for how long the award was; and we are kept ignorant of what subsequent bids were and why plaintiff either could not, or elected not to, compete with New Jersey Clipping for subsequent years. Certainly there is no basis for surmising that once lost, the state business was gone forever. Indeed, there is evidence in this case that the plaintiff was able to win customers from New Jersey Clipping after having lost them to that firm.

*St. Elizabeth's College* : This account switched from Garden State to New Jersey Clipping at the same rate. The claim for damages is rejected.

*William G. Hetherington & Co.* : This account became a New Jersey Clipping customer at matched rates, higher rates and rates reflecting New Jersey's public relations firms' rates. The claim for damages is rejected.

*New Jersey Historical Society* : This account went to New Jersey Press Clipping pursuant to the State of New Jersey contract on October 1, 1971; and is subject to the same analysis as was made with respect to the state agencies. The claim for damages as to this item is rejected.

*New Jersey Builders Association* : This account became a client of New Jersey Clipping at the same rate as it was paying Garden State. The claim for damages is rejected.

*New Jersey Heart Association* : At the time this account became a client of New

---

26. Plaintiff boldly states that $.16 a clip for New Jersey is a predatory price (i. e., below all but incremental cost) yet claims that its profit on a $.18 bid is 52% thereof, or about $.09.

Jersey Clipping, it was not using a press clipping service. The claim for damages is rejected.

*RAM Associates*: Plaintiff has elicited no testimony as to the reason for this account going to New Jersey. The claim for damages is rejected.

*Easter Seal Society*: This is a seasonal order, i. e., it comes on and goes off, and in January of 1976 the defendants were servicing it. There is no basis for computing any reliable damages figure.

*Gill School*: This account went to New Jersey Clipping at a higher rate and returned to Garden State two months later at a lower rate. The claim for damages is rejected.

*Mobile Home Owners Association*: This account went to New Jersey Clipping at a matched rate. The claim for damages is rejected.

*Seymour Malkin*: This account left Garden State and went to New Jersey for a two-month period and then returned to Garden State at rates dictated by Malkin to William Weber. The claim for damages is rejected.

There are other customers who, it is claimed, were lost to New Jersey Clipping. No purpose would be served in dealing further with them. What has already been stated as to other specific customers is appropriate as to the remainder.

There is, moreover, an overriding defect in this aspect of plaintiff's damage claim. As has been said, the claim as recited in plaintiff's Proposed Findings of Fact is in terms of lost gross revenues. However, by separate submission to the court, plaintiff claims only lost profit, 52% of the claimed lost gross revenue. Presumably, this is based upon Baker's computations. The flaws in his computations have already been discussed. It is noteworthy that the 52% rate does not include any figure for salary for Weber and Mrs. Weber. Thus, for the reasons stated, the plaintiff's evidence on damages falls far short, both quantitatively and qualitatively, of that required to establish (a) the fact of damages, (b) the causal relationship and (c) the amount of damages. *Coleman v. Chrysler Motors*, 525 F.2d 1338 (3d Cir. 1975).

CONCLUSION

The foregoing sets forth my Findings of Fact and Conclusions of Law under Fed.R. Civ.P. 52.

Judgment will be entered consistent with the foregoing and in favor of the defendants, with costs. Settle the form thereof, on notice, within ten days.